IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
### (Memorandum Web Opinion)

IN RE INTEREST OF HANNAH C. & RAYNA C.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF HANNAH C. & RAYNA C., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

CAMERON C., APPELLANT.

Filed May 23, 2017.    No. A-16-1101.

Appeal from the Separate Juvenile Court of Douglas County: ELIZABETH CRNKOVICH, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, and Lauren A. Walag for appellant.

Donald W. Kleine, Douglas County Attorney, and Kati M. Kilcoin for appellee.

MOORE, Chief Judge, and PIRTLE and BISHOP, Judges.

PIRTLE, Judge.

### INTRODUCTION

Cameron C. appeals the order of the separate juvenile court of Douglas County which terminated his parental rights to the minor children, Hannah C. and Rayna C. The juvenile court found that grounds for termination existed under one or more subsections of Neb. Rev. Stat. § 43-292 (Reissue 2016), and that the State proved, by clear and convincing evidence, that termination of Cameron's parental rights was in the children's best interests. For the reasons that follow, we affirm.

BACKGROUND

Cameron is the father of Hannah, born in March 2014, and Rayna, born in June 2016.

On February 11, 2015, the State filed a petition alleging the minor child, Hannah, came within the meaning of Neb. Rev. Stat. § 43-247(3)(a) due to the faults or habits of her father, Cameron, and her mother, Athena S. With regard to Cameron, the petition alleged that: (A) he engages in domestic violence with Athena; (B) he failed to provide proper parental care, support, and/or supervision for Hannah; and, (C) due to these allegations, Hannah is at risk for harm. On the same day, the juvenile court filed an ex parte motion for custody, placing Hannah in the custody of the Nebraska Department of Health and Human Services (DHHS). The order stated that placement for Hannah should exclude the home of Cameron and Athena.

An adjudication hearing was held on May 19, 2015, and Cameron admitted Counts II-A and II-C of the petition. The court found, by a preponderance of the evidence, that Hannah came within the meaning of § 43-247(3)(a) due to the faults or habits of her father. Hannah was ordered to remain in the temporary custody of DHHS for appropriate care and placement. Count II-B of the petition was dismissed.

Disposition and permanency planning hearings were held on July 17, September 17, and December 17, 2015. Following each hearing, the court found that, at that time: the permanency objective was reunification; that reasonable efforts had been made to return Hannah to the parental home; that it would be contrary to the health, safety, and welfare of the minor child to return to the parental home at that time; and that it was in Hannah's best interests to remain in the temporary custody of DHHS. The court also ordered Cameron to participate in services which included: (1) random drug testing; (2) a 36-week domestic violence class; (3) family support services to address housing and employment; (4) supervised visitation with Hannah; (5) a parenting course; and, (6) completing a psychological evaluation and chemical dependency evaluation.

Another hearing was held on May 19, 2016, and the permanency objective was changed to "reunification with the mother with a concurrent plan of adoption."

On June 13, 2016, the State filed a supplemental petition alleging that the minor child, Rayna C., lacked parental care due to the fault or habits of Athena and Cameron. With regard to Cameron, the petition alleged: (A) Cameron has an open juvenile court case involving Hannah, a sibling to Rayna, due to being a perpetrator of domestic violence; (B) Cameron has been provided services to reunify with Hannah, including but not limited to: evaluations, domestic violence batterer's classes, family support, and UAs; (C) he failed to participate in the offered services; (D) he has not reunified with Hannah, despite the provision of services; and, (E) due to these allegations, Rayna is at risk for harm. On the same date, the juvenile court issued an order for immediate custody, placing Rayna in the custody of DHHS, with placement to exclude the homes of Athena and Cameron.

On or about June 20, 2016, the State filed a second supplemental petition and a motion to terminate Cameron's parental rights as to Rayna, and a second motion for termination of Cameron's parental rights as to Hannah.

A hearing was held on the State's petitions on October 28, 2016. A supervisor for the drug testing department at Owens and Associates testified that Cameron was a client from October 2,

2015 to January 15, 2016 after he was referred by Nebraska Families Collaborative (NFC). During that period he completed 4 UAs and failed to complete 31 attempts to submit a sample. Cameron was discharged from services after 30 days of no compliance or no response.

Another supervisor for Owens and Associates testified that the company provided visitation services to Cameron and Hannah from March 4, to April 9, 2015. During that time Cameron was offered 12 visits and he participated in 3. Cameron was discharged from services on April 9 for lack of participation. Owens and Associates received a second referral on October 21. Cameron was offered 50 visits between October 2015 and October 2016. The visits were scheduled once per week for two hours. Cameron attended 32 visits, and ended 10 of those visits 15 minutes to 1 hour early. The supervisor testified that Cameron often came to visits without the necessary supplies for the children, including diapers, food, or formula.

An Omaha police officer testified that he responded to a call reporting a disturbance at a supermarket on April 23, 2016 at 3:40 p.m. Two officers made contact with Cameron and eventually called an ambulance to transport him to a hospital because Cameron was exhibiting bizarre behavior and was perceived to be a danger to others. Cameron had been in and out of the store, he was pacing, and he was approaching people and cars driving through the parking lot. Cameron was observed to be sweating profusely and acting in a threatening manner toward strangers, invading their personal space and yelling. Cameron told the responding officers that he was concerned for his safety and the safety of his mother, and believed that people "were trying to get him."

Kyle McNamara, a family permanency specialist with NFC testified that Hannah became a ward of the State in February 2015 and had not returned to custody of either parent. Rayna became a ward of the State in June 2016, immediately upon her birth, because neither parent had progressed toward reunification with Hannah, and because substance abuse and domestic violence continued to be a concern.

McNamara provided referrals for drug testing, a chemical dependency evaluation, a psychological evaluation, domestic violence classes, visitation, and family services, and Cameron was allowed assistance with the associated costs, as needed. Cameron did not complete the psychological evaluation, or the chemical dependency evaluation and he did not start the 36 week domestic violence class. He did not consistently participate in family support.

McNamara testified that it was "incredibly difficult" to maintain consistent contact with Cameron because he changed phone numbers several times and he went to jail "at least three different times" during the pendency of this case. McNamara testified that he was notified the day before the termination hearing that Cameron had been arrested and was incarcerated. McNamara said Cameron started drug testing with Heartland Family Services on August 6, 2015, but he was discharged on August 30 due to incarceration. Cameron also began periods of incarceration in February 2015, and February 2016. Cameron's participation in visits was inconsistent, and scheduled visits were discontinued during his periods of incarceration.

McNamara testified that prior to the May 2016 hearing, he received one phone call from Cameron who stated that he did not understand why services were court-ordered and expressed his belief that his treatment was not fair. McNamara explained that services had been ordered for a

year, and that Cameron needed to demonstrate to the court that he could rehabilitate himself and address the reasons for which the children had been removed from his care.

McNamara testified that at the hearing in May 2016, he recommended that no further reasonable efforts be ordered for Cameron, because NFC had offered services for him and he had utilized "next to none of them." He also recommended a change in the permanency objective to include a concurrent plan of adoption.

McNamara testified that he believed Rayna would be at risk for harm if she was returned to Cameron's care. He also testified that he believed termination of Cameron's parental rights was in Hannah and Rayna's best interests.

On October 31, 2016, the juvenile court filed an order adjudicating Rayna as a child within the meaning of § 43-247(3)(a) due to the faults or habits of her father, by a preponderance of the evidence. The court found that grounds for termination of Cameron's parental rights to Rayna were established under § 43-292(2), and that termination of Cameron's parental rights was in her best interests. The court also found that statutory grounds for termination of Cameron's parental rights to Hannah were established under § 43-292(2), (6), and (7), and that termination of Cameron's parental rights was in her best interests.

Cameron timely appealed.

## ASSIGNMENT OF ERROR

Cameron asserts the juvenile court erred in terminating his parental rights because the State failed to adduce clear and convincing evidence that such termination was in the children's best interests.

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches a conclusion independently of the juvenile court's findings. *In re Interest of Alec S.*, 294 Neb. 784, 884 N.W.2d 701 (2016).

## ANALYSIS

The bases for termination of parental rights in Nebraska are codified in § 43-292. Section 43-292 provides 11 separate conditions, any of which can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child. *In re Interest of Sir Messiah T. et al.*, 279 Neb. 900, 782 N.W.2d 320 (2010).

In its order terminating Cameron's parental rights to Hannah and Rayna, the juvenile court found that the State proved by clear and convincing evidence that grounds for termination of Cameron's parental rights to both children exist under § 43-292(2), and that grounds also existed for termination of his parental rights to Hannah under § 43-292(6) and (7).

Cameron does not contest the juvenile court's finding that grounds for terminating his parental rights exist. Upon our de novo review, we find the evidence supports the court's conclusion that grounds for termination under one or more subsections of § 43-292 did, in fact, exist.

Section 43-292(7) provides for termination of parental rights when "[t]he juvenile has been in out-of-home placement for fifteen or more months of the most recent twenty-two months." Hannah was removed from parental care on February 11, 2015, and was not returned, at any point, to Cameron's custody. At the time the motion to terminate parental rights was filed in June 2016, Hannah had been in out-of-home placement for approximately 16 months. Our de novo review of the record clearly and convincingly shows that grounds for termination of Cameron's parental rights as to Hannah, under § 43-292(7), were proved by sufficient evidence.

Subsection 43-292(2) provides that the parents have substantially and continuously or repeatedly neglected and refused to give the juvenile or a sibling of the juvenile necessary parental care and protection. The question of what constitutes neglect and necessary parental care and protection is generally determined on a case-by-case basis. Common factual patterns often found to establish neglect include parental incarceration, adjudication, involuntary termination, or relinquishment of previous children, unsanitary house and unkempt children, and addiction to drugs or alcohol. See *In re Interest of Elijah P. et al.*, 24 Neb. App. 521, 891 N.W.2d 330 (2017).

The evidence shows that when given the chance to rehabilitate himself, Cameron was either unwilling or unable to fully participate in the court-ordered services, despite being informed that failure to participate was a barrier to reunification with his children. He failed to complete the required chemical dependency and psychological evaluations, and the domestic violence and parenting courses. He was discharged from drug testing because he was non-compliant or non-responsive, and his attendance at supervised visitation sessions was inconsistent. When he did attend scheduled visitation, he often failed to provide the necessary supplies including food and diapers for the children. The evidence shows he was incarcerated off and on throughout this case. The decisions he made which led to his incarceration prevented him from fulfilling his parental obligations to his children and hampered his ability to work toward reunification.

The evidence establishes clearly and convincingly that during the pendency of this case, Cameron substantially and repeatedly neglected Hannah and Rayna and refused to give them the necessary parental care and protection. Therefore, the statutory grounds for termination of Cameron's parental rights to both children under § 43-292(2) are satisfied.

If an appellate court determines that the lower court correctly found that termination of parental rights is appropriate under one of the statutory grounds set forth in § 43-292, the appellate court need not further address the sufficiency of the evidence to support termination under any other statutory ground. *In re Interest of Giavonna G.*, 23 Neb. App. 853, 876 N.W.2d 422 (2016). The next inquiry is whether termination is in the children's best interests.

In addition to proving a statutory ground, the State must show that termination is in the best interests of the children. A termination of parental rights is a final and complete severance of the child from the parent and removes the entire bundle of parental rights; therefore, with such severe and final consequences, parental rights should be terminated only in the absence of any reasonable alternative and as a last resort. *In re Interest of Giavonna G., supra.*

There is a rebuttable presumption that the best interests of a child are served by having a relationship with his or her parent. Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that the parent is unfit. *In re Interest of Kendra M. et al.*, 283 Neb. 1014, 814 N.W.2d 747 (2012). Parental unfitness means

a personal deficiency or incapacity which has prevented, or will prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being. *Id.* The best interests and parental fitness analysis are fact-intensive inquiries, and while both are separate inquiries, each examines essentially the same underlying facts as the other. *Id.*

The juvenile court found the State established by clear and convincing evidence that termination of Cameron's parental rights was in the children's best interests. He asserts the juvenile court erred in reaching this conclusion. Cameron argues that he has made "significant strides" with respect to his parenting skills and he participates in visitation with "greater regularity than at the outset of this case." Brief for Appellant at 9. He argues that the record is devoid of any indication that there were safety concerns during visits and that there is evidence that he shares a beneficial relationship with the children.

As previously discussed, the record shows that Cameron was afforded numerous opportunities to rehabilitate himself and build a relationship with Hannah and Rayna, but he did not comply with court-ordered services and failed to make any appreciable progress throughout this case. Cameron did not complete the chemical dependency and psychological evaluations, he did not start the domestic abuse or parenting courses, and he was discharged from two different drug testing services for failure to respond or provide the required samples.

Cameron was referred for family support services in August 2015 with the goal of maintaining employment and housing, and learning how to budget. He did not participate in this service immediately, and although there is some evidence that he became more consistent over time, he was unable to continue with these services when he was incarcerated in February 2016. He was unsuccessfully discharged from his referral for family services.

Cameron was discharged from visitation services after attending only 3 of the 12 visits offered between March 4, and April 9, 2015. A second referral was made in October 2015, and he attended 32 of the 50 scheduled two-hour visits over the next year. Cameron's incarceration interfered with his ability to regularly attend scheduled weekly visits with the children. The evidence shows that when he did attend visits, he frequently arrived without the necessary supplies for the children, and he ended several visits early. Cameron made no progress toward a lower level of supervision or more frequent visitation, and has not progressed toward reunification with either of the children.

Although the record before us does not contain specific information regarding the reasons for his periodic incarceration, it does demonstrate that he continues to make choices that result in incarceration, which further prevents him from being available to be in Hannah and Rayna's lives. Based upon our de novo review of the record, we find clear and convincing evidence that Cameron's personal deficiencies have prevented him from performing his reasonable parental obligations to Hannah and Rayna, and would likely prevent him from doing so in the future. Accordingly, the presumption of fitness has been rebutted.

Nebraska courts have recognized that children cannot, and should not, be suspended in foster care or be made to wait uncertain parental maturity. *In re Interest of Giavonna G., supra.* Where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights. *In re Interest of Zanaya W.*

*et al.*, 291 Neb. 20, 863 N.W.2d 803 (2015). We also find that the State demonstrated by clear and convincing evidence that termination of Cameron's parental rights is in the children's best interests.

## CONCLUSION

Upon our de novo review, we find the evidence presented was sufficient to warrant termination of Cameron's parental rights to Hannah and Rayna, and that termination is in the children's best interests. Therefore, we affirm.

AFFIRMED.